# UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

TEENA FOY,

*Appellant*,

v.

FLORIDA COMMISSION ON OFFENDER REVIEW, ET AL.,

*Appellees*.

Appeal from the U.S. District Court for the Northern District of Florida

Honorable Mark E. Walker, Chief District Judge

Civil Case 4:24-CV-140-MW/MAF

## APPELLANT'S OPENING BRIEF ON THE MERITS

## ORAL ARGUMENT REQUESTED

Marc J. Randazza
FL Bar No. 625566
RANDAZZA LEGAL
GROUP, PLLC
2 S. Biscayne Blvd,
Suite 2600
Miami, FL 33131
(888) 887-1776
ecf@randazza.com

Andrew B. Greenlee
FL Bar No. 96365
ANDREW GREENLEE, P.A.
401 E. 1st Street, Unit 261
Sanford, FL 32772
(407) 808-6411
andrew@greenleelaw.com

Carrie Ann Goldberg
*Pro Hac Vice*
C.A. GOLDBERG, PLLC
16 Court Street,
33rd Floor
Brooklyn, NY 11241
Tel: (646) 666-8998
carrie@cagoldberglaw.com

*Attorneys for Plaintiff*

**STATEMENT OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT**

Pursuant to 11th Cir. R. 26.1-1, counsel for Appellant Teena Foy hereby certifies that the following persons, firms, and entities have, or may have had, an interest in the outcome of this appeal:

1. Andrew B. Greenlee, P.A. (Law Firm representing Plaintiff-Appellant);

2. C.A. Goldberg, PLLC (Law Firm representing Plaintiff-Appellant);

3. Coonrod, Melinda N. (Former Commissioner for Defendant-Appellee Florida Commission on Offender Review);

4. Davidson, Richard D. (Defendant-Appellee);

5. Florida Commission on Offender Review (Defendant-Appellee);

6. Fitzpatrick, Honorable Martin A. (United States Magistrate Judge for the Northern District of Florida);

7. Foy, Teena (Plaintiff-Appellant);

8. Goldberg, Carrie Ann (Counsel Plaintiff-Appellant);

9. Graham-Foy, Scott (Son of Plaintiff-Appellant);

10. Greenlee, Andrew Brooks (Counsel for Plaintiff-Appellant);

11. Lamia, Christina Edwards (Counsel for Defendants-Respondents in District Court);

12. Newhall, Timothy L. (Counsel for Defendants-Appellees);

13. Randazza Legal Group, PLLC (Law Firm representing Plaintiff-Appellant);

14. Randazza, Marc John (Counsel for Plaintiff-Appellant);

15. Spears, Sara E. (Counsel for Defendants-Appellees);

16. Walker, Honorable Mark E. (United States District Court Judge for the Northern District of Florida);

17. Whitworth, Susan M. (Defendant-Appellee);

18. Wyant, David A. (Defendant-Appellee).

No publicly traded company or corporation has an interest in the outcome of this appeal.

Respectfully submitted,

/s/ Marc J. Randazza
MARC J. RANDAZZA
RANDAZZA LEGAL GROUP, PLLC
2 S. Biscayne Blvd,
Suite 2600
Miami, FL 33131
*Counsel for Plaintiff*

**STATEMENT REGARDING ORAL ARGUMENT**

Oral argument is desired. This appeal presents novel and complex issues warranting oral argument, including (1) the application of the voluntary cessation doctrine to a parole condition rescinded opportunistically during the claimant's son's temporary detention, where recurrence remains likely under the Commission's unrenounced policy; (2) whether a chilling effect on communal religious worship— stemming from a reasonable fear of incidental familial contact—confers standing for a First Amendment free exercise claim, particularly in a hybrid-rights context involving intimate association; and (3) the interplay between federal due process protections and state-conferred victim rights under Florida's "Marsy's Law," which defines the very liberty interests violated by the appellee.

These questions implicate significant public interests in balancing victim autonomy, religious liberty, and familial reconciliation in conditional carceral release decisions. Oral argument would assist the Court in clarifying these multifaceted doctrinal and factual nuances.

# TABLE OF CONTENTS

Page

STATEMENT OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT................................................................i

STATEMENT REGARDING ORAL ARGUMENT ............................ iii

TABLE OF CONTENTS ...................................................................iv

TABLE OF AUTHORITIES........................................................ vii

STATEMENT OF SUBJECT MATTER  AND APPELLATE JURISDICTION....1

STATEMENT OF THE ISSUES ..........................................................1

STATEMENT OF THE CASE ..........................................................3

I.  Course of Proceedings and Dispositions Below ............................3

II.  Statement of the Facts..................................................................4

III.  Standards and Scope of Review....................................................7

SUMMARY OF ARGUMENT..........................................................10

ARGUMENT ...................................................................................13

I.  Foy Properly Established Standing for Her Free Exercise Claim................13

    A.  The First Amendment Free Exercise Clause Protects Foy's Right to Choose Which Church to Attend.......................................15

        1.  Catholic Services Are Deeply Social in Nature ...........................16

        2.  Certain Catholic Services, Such as the Communal Penance Service, Require Community Involvement .................................16

        3.  Choice and Selection of Parish Is a Deeply Personal Decision, Catholic Sects Possess Broad Variation, and Different Catholic Sects Are Decidedly Not Interchangeable....................................17

    B.  The FCOR's Actions Terminated Foy's Capacity to Make This Determination, and Foy Was Not Afforded Any Due Process...........20

    C.  Foy's Alleged Fear Was Sufficient to Create Standing.....................23

D.    The District Court's Reliance on Graham-Foy's Unknown Piety Does Not Undo Foy's Reasonable Fear.......................................................25

E.    The Visitation of the Earthly Harm on Graham-Foy Does Not Mitigate the Separate Spiritual Harm on Foy ....................................27

II.    The District Court improperly applied the voluntary cessation doctrine to Foy's Freedom of Association and Procedural Due Process Claims .....................28

A.    Defendants Have Not Met the *Cambridge Christian School* Factors.29

1.    The Change Was Not Due to "Substantial Deliberation" but Rather Was Prompted by a Cynical Attempt to Capitalize on Graham-Foy's Actions. ............................................................29

2.    The Decision to End the Conduct Cannot Reasonably Be Viewed as Sincerely Being Permanent and Complete..............................30

3.    The Government Has Consistently Maintained Its Intent to Impose These Restrictions in the Face of All Reason.................31

B.    The Vast Weight of the Defendants Actions Demonstrate That They Strongly Desire to Prevent Foy and Graham-Foy from Having Any In-Person Contact, and Defendants Are Likely to Reimpose the Restrictions at the Earliest Opportunity...............................................31

C.    Foy's Victim Status Is a Governmentally Assigned Infirmity, Not Subject to Mootness.................................................................................33

D.    Avoiding an Award of Attorneys' Fees was the Primary Factor that Drove FCOR to Attempt to Moot the Case. ........................................34

III.    The Court erred dismissing counts VI and VII because the claims are intertwined with federal constitutional rights under 42 U.S.C. § 1983 ..................35

A.    The Florida Constitutional Provisions Form an Integral Part of Ms. Foy's Federal Claims.......................................................................37

B.    The Eleventh Amendment and *Pennhurst* Do Not Bar Consideration of the State Provisions in This Federal Context ................................39

C.    The Dismissal Was an Abuse of Discretion Under § 1367(c)(1) .......41

CONCLUSION ......................................................................................................44

CERTIFICATE OF SERVICE..............................................................................46

CERTIFICATE OF COMPLIANCE ......................................................................47

CERTIFICATE OF DIGITAL SUBMISSION ......................................................48

# TABLE OF AUTHORITIES

## Cases

*303 Creative LLC v. Elenis*, 600 U.S. 570 (2023) .................................................25

*Ameritox, Ltd. v. Millennium Labs., Inc.*, 803 F.3d 518 (11th Cir. 2015).....9, 38, 43

*Aycock v. R.J. Reynolds Tobacco Co.*, 769 F.3d 1063 (11th Cir. 2014) ............9, 37

*Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564 (1972).......................38, 42

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) ...........................................27

*Brown v. Ga. Dep't of Revenue*, 881 F.2d 1018 (11th Cir. 1989)....................41, 42

*Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014) ...................................28

*Cambridge Christian Sch., Inc. v. FHSAA*, 115 F.4th 1282 (11th Cir. 2024)....9, 29, 30, 31, 32

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520 (1993) ..17

*City of Boerne v. Flores*, 521 U.S. 507 (1997)...........................................20, 22, 25

*Clapper v. Amnesty Int'l USA,* 568 U.S. 398 (2013)...............................................25

*Corbett v. Transp. Sec. Admin.*, 930 F.3d 1225 (11th Cir. 2019)............................8

*Dobbs v. Jackson Women's Health Org.,* 597 U.S. 215 (2022)..............................34

*Doe v. Moore*, 410 F.3d 1337 (11th Cir. 2005)......................................................44

*Employment Division v. Smith*, 494 U.S. 872 (1990).......................................14, 21

*Ewing Indus. Corp. v. Bob Wines Nursery, Inc.*, 795 F.3d 1324 (11th Cir. 2015)...9, 37, 43

*Ex parte Young*, 209 U.S. 123 (1908) ...................................................................42

*FBI v. Fikre*, 601 U.S. 234 (2024)...............................................29, 31, 32, 34, 35

*FCC v. Consumers' Rsch.*, 144 S. Ct. 2102 (2024)................................................34

*Fulton v. City of Philadelphia*, 593 U.S. 522 (2021) ........................................23, 25

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418 (2006) ..............................................................................20, 21, 22, 23, 25, 28

*Hosanna-Tabor Evangelical Lutheran Church and School v. EEOC*, 565 U.S. 171 (2012) ...............................................................................................15

*Kedroff v. Saint Nicholas Cathedral*, 344 U.S. 94 (1952)...................................15

*Kennedy v. Bremerton School District*, 597 U.S. 507 (2022) ............................15

*Kentucky Dep't of Corr. v. Thompson*, 490 U.S. 454 (1989)..................................40

*Lackey v. Stinnie*, 145 S. Ct. 659 (2025) ...............................................................36

*Laird v. Tatum*, 408 U.S. 1 (1972) .........................................................................24

*Lawrence v. Dunbar*, 919 F.2d 1525 (11th Cir. 1990)..............................................8

*Little Sisters of the Poor Saints Peter and Paul Home v. Pennsylvania*, 140 S. Ct. 2367 (2020) ...................................................................................................23

*Lucero v. Trosch*, 121 F.3d 591 (11th Cir. 1997)........................................9, 38, 43

*Mathews v. Eldridge*, 424 U.S. 319 (1976)..........................................................22

*McCabe v. Sharrett*, 12 F.3d 1558 (11th Cir. 1994) .............................................40

*McElmurray v. Consol. Gov't of Augusta-Richmond Cnty.*, 501 F.3d 1244 (11th Cir. 2007).............................................................................................................8

*Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214 (11th Cir. 2004)........25

*Our Lady of Guadalupe School v. Morrissey-Berru*, 140 S. Ct. 2049 (2020) ........17

*Parker v. Scrap Metal Processors, Inc.*, 468 F.3d 733 (11th Cir. 2006) ...........9, 43

*Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89 (1984) 3, 37, 41, 42, 43, 44

*Roberts v. U.S. Jaycees*, 468 U.S. 609 (1984)........................................................40

*Roe v. Wade*, 410 U.S. 113 (1973) ........................................................34

*Sheely v. MRI Radiology Network, P.A.*, 505 F.3d 1173 (11th Cir. 2007)............8, 9

*Sherbert v. Verner*, 374 U.S. 398 (1963).................................................25

*Speech First, Inc. v. Cartwright*, 32 F.4th 1110 (11th Cir. 2022) ...........................25

*State v. Graham-Foy*, No. 16-2025-CF-000297-AXXX-MA (Fla. Cir. Ct.) (case still pending)........................................................................7

*Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014) ..........................24, 26, 27

*Swann v. Secretary, Georgia*, 668 F.3d 1285 (11th Cir. 2012)..............................27

*Troiano v. Supervisor of Elections in Palm Beach Cnty.*, 382 F.3d 1276 (11th Cir. 2004)........................................................................8, 33

*Turner v. Rogers*, 564 U.S. 431 (2011) ...........................................34, 35

*United Mine Workers of Am. v. Gibbs*, 383 U.S. 715 (1966)...........................40, 43

*United States v. W.T. Grant Co.,* 345 U.S. 629 (1953) ..........................................31

*Warren v. DeSantis*, 90 F.4th 1115 (11th Cir. 2024) .................................41, 42, 44

*Wisconsin v. Yoder*, 406 U.S. 205 (1972) ........................................14, 28

*Wollschlaeger v. Governor of Florida*, 848 F.3d 1293 (11th Cir. 2017) ................25

**Constitutional Provisions**

Fla. Const. art 1, § 16..............................................................2, 30, 33

**Statutes**

28 U.S.C. § 1291 .....................................................................1

28 U.S.C. § 1331 .....................................................................1

28 U.S.C. § 1367(c)(1) ....................................................7, 30, 36, 37, 38

42 U.S.C. § 1983 .................................................1, 2, 3, 5, 30

42 U.S.C. § 2000bb *et seq.* ...............................................................17, 18, 19, 21, 24

42 U.S.C. § 2000cc *et seq.* ......................................................................22

Fla. Stat. § 761.01 *et seq.* ......................................................................18

**Rules**

Fed. R. Civ. P. 12(b)(1) ...............................................................................7

Fed. R. Civ. P. 12(b)(6) ...............................................................................7

**Other Authorities**

Catechism of the Catholic Church, 2nd ed. (Vatican City: Libreria Editrice

    Vaticana, 1997) .............................................................................14, 15

Catholic Church, Second Vatican Council, Constitution on the Sacred Liturgy,

    *Sacrosanctum Concilium*, Dec. 4, 1963 .............................................14

## STATEMENT OF SUBJECT MATTER
## AND APPELLATE JURISDICTION

The District Court had jurisdiction under 28 U.S.C. § 1331 and 42 U.S.C. § 1983. This Court has appellate jurisdiction under 28 U.S.C. § 1291. The district court entered its final order on April 22, 2025, and Foy filed a timely notice of appeal on May 19, 2025. Doc 101 - Pg 1; Doc 103 - Pg 1.

## STATEMENT OF THE ISSUES

This is a civil rights action brought under 42 U.S.C. § 1983 by Plaintiff-Appellant Teena Foy against officials of the Florida Commission on Offender Review ("FCOR") in their official capacities. The suit challenges a "No Victim Contact" condition imposed on her adult son's conditional release from prison, which prohibited all contact between Plaintiff and her son, Scott Graham-Foy. However, this case is not about the *prisoner's* rights, but rather Ms. Foy's rights, independent of her son's rights. Foy alleged violations of her First and Fourteenth Amendment rights, including her rights to free speech, free association, and procedural due process. The issues presented are:

1. Whether the district court erred in dismissing Ms. Foy's First Amendment Free Exercise claim for lack of standing, where she plausibly alleged a substantial burden on her religious exercise; specifically, a chilling effect preventing her from attending her preferred Catholic parish due to the reasonable fear that incidental contact with her son during communal worship

could violate his no-contact condition and lead to his reincarceration, despite the Appellee's imposition of the no-contact restriction against Ms. Foy's wishes and without individualized assessment, due process, or strict scrutiny, and notwithstanding precedents recognizing such indirect coercions and self-censorship as cognizable injuries.

2. Whether the district court erred in dismissing Ms. Foy's First Amendment Freedom of Association claim and Fourteenth Amendment Procedural Due Process claim as moot under the voluntary cessation doctrine, where the appellee's removal of the no-contact condition was opportunistic, contingent on her son's temporary detention, limited to his current conditional release term, and failed to meet the stringent burden of proving permanence and non-recurrence, particularly given the Appellee's persistent paternalistic policy against victim waivers and the applicability of the capable of repetition yet evading review exception for short-duration restrictions.

3. Whether the district court erred in dismissing Ms. Foy's claims under Article I, § 16 of the Florida Constitution and her Declaratory Judgement claim by declining supplemental jurisdiction under 28 U.S.C. § 1367(c)(1) on grounds of novel state-law issues, where those claims are inextricably intertwined with her federal constitutional rights under 42 U.S.C. § 1983, serving to define protected liberty interests in due process and intimate familial association violated by the FCOR's denial of her right to be heard at

the public hearing, thus rendering the dismissal an abuse of discretion premised on legal error and misapplication of *Pennhurst*.

## STATEMENT OF THE CASE

### I.    Course of Proceedings and Dispositions Below

Ms. Foy filed her initial complaint on March 28, 2024. This was followed by a motion for a preliminary injunction on April 2, 2024. Doc 9 - Pg 1. On May 6, 2024, Plaintiff filed an amended complaint and a motion to substitute parties. Doc 33 - Pg 1; Doc 34 - Pg 1. The court denied the motion to substitute on May 7, 2024, and the same day denied the preliminary injunction, on standing grounds. Doc 36 - Pg 1; Doc 37 - Pg 11. After amending her complaint on May 16, 2024, Plaintiff renewed her motion for preliminary injunction. Doc 42 - Pg 1; Doc 43 - Pg 1. On July 25, 2024, the district court granted in part the preliminary injunction motion, finding that Plaintiff was likely to succeed on her First Amendment freedom of association claim and ordering Defendants to modify the no-contact condition to allow monitored communication. Doc 64 - Pg 31.

The Second Amended Complaint asserting seven counts, including First Amendment and due process claims, a count based on the Florida Constitution, and a count for declaratory judgement which implicates both the Florida and United States Constitutions. Doc 42 - Pg 18–21. Defendants moved to dismiss. Doc 70 - Pg 1. On November 25, 2024, the district court granted in part and denied in part the motion to dismiss, dismissing Plaintiff's claims grounded in freedom of religion,

3

freedom of speech, and the Florida Constitution, but allowing her freedom of association and procedural due process claims to proceed. Doc 80 - Pg 14–15.

Plaintiff later moved for partial summary judgment and a permanent injunction on her freedom of association claim. Doc 94 - Pg 1. However, on April 22, 2025, the district court granted Defendants' second motion to dismiss, finding that the case was moot because FCOR rescinded the no-contact condition. Doc 101 - Pg 1. Judgment was entered the same day, and this appeal followed.

## II.    Statement of the Facts

Plaintiff-Appellant Teena Foy is a 78-year-old devout Catholic woman in poor health, diagnosed with kidney cancer and severe cardiovascular disease. Doc 42 - Pg 4–6. Her only living relative is her beloved but troubled son, Scott Graham-Foy. Doc 42 - Pg 5. In 2011, Mr. Graham-Foy, then struggling with drug addiction and in a drug-induced state, attacked Ms. Foy. Doc 42 - Pg 5. Ms. Foy did not report this matter to the police. Doc 43-1 - Pg 8–9.  Rather, the officers were allowed into the emergency room during Ms. Foy's treatment. Doc 43-1 - Pg 20–21.

Scott Graham-Foy pled guilty and was sentenced to 15 years in prison. Doc 43 - Pg 10; Doc 26 - Pg 4. While incarcerated, Graham-Foy attained sobriety, and he and Ms. Foy repaired their relationship. Doc 42 - Pg 5; Doc 43 - Pg 3. Ms. Foy forgave her son and sought to resume a familial relationship rooted in her religious beliefs. Doc 42 - Pg 4–6; Doc 42 - Pg 8; Doc 42 - Pg 12.  The prison allowed Ms. Foy and her son to have physical contact, and they commenced each visit with an

embrace. Doc. 41 - Pg 33. At the end of their visits, they would hug again and Mr. Graham-Foy would give her a kiss on the cheek to say goodbye. Doc. 41 - Pg 11.

On March 21, 2024, FCOR granted Mr. Graham-Foy conditional release through June 20, 2026. Doc 42 - Pg 5. As a condition of that release, FCOR imposed a "No Victim Contact" provision, which entirely barred any contact or communication between Ms. Foy and her son, despite her express and repeated opposition to such a restriction, despite their ability to have such contact while he was incarcerated, and despite the fact that *any other member of the community* could have unfettered contact with Mr. Graham-Foy. Doc 42 - Pg 5–6; Doc 42-2 - Pg 1. Ms. Foy was of sound mind to assess her own safety and welcomed the practical and emotional support she and her son could offer one another. She was permitted to *attend* the FCOR hearing at which the condition was imposed but was informed her comments would not be considered, and she was provided no direct mechanism to appeal the decision. Doc 42 - Pg 5; Doc 42 - Pg 18; Doc 64 - Pg 2–4. In short, this was Mr. Graham-Foy's hearing, not Ms. Foy's, and she had no meaningful opportunity to be heard, despite the fact that her rights were affected.

Mr. Graham-Foy, for his part, sought to modify the terms of his conditional release in state court. Doc. 43-7. He initially succeeded, Doc. 43-8; however, FCOR intervened and convinced the trial court to rescind its order modifying the conditions of his conditional release. Doc. 43-9 - Pg 8-9. Thus, though he could meet with any

other law-abiding member of the community, Mr. Graham-Foy would go back to prison if he so much as called his own mother.

Ms. Foy filed suit under 42 U.S.C. § 1983, asserting violations of her rights to freedom of association, free speech, free exercise of religion, procedural and substantive due process, and also asserting state constitutional and declaratory relief claims. Doc 1 - Pg 1; Doc 42 - Pg 1. The district court dismissed several of these claims but held that her freedom of association and procedural due process claims stated valid federal questions and were supported by standing and non-mootness. Doc 80 - Pg 7–8.

On July 25, 2024, the court partially granted a preliminary injunction, finding Ms. Foy was likely to succeed on her First Amendment association claim. Doc 64 - Pg 1. It directed FCOR to modify Mr. Graham-Foy's conditions of release to permit monitored communication between mother and son. Doc 64 - Pg 27.

Throughout the case, FCOR insisted at every juncture that it would not modify the conditions. In fact, FCOR objected to Ms. Foy and Mr. Graham-Foy even being in the same courtroom during the hearings in this case. Doc 43-1 - Pg 88–89. Further, FCOR found its decisions to be so well-founded, that it even strenuously objected to Ms. Foy being in the room while Mr. Graham-Foy testified over phone or over video conference, dare one of them communicate to the other. Doc 43-1 - Pg 88–89. Ms. Foy had substantially more rights to associate with her son when he was in jail and she regularly visited.

In January 11, 2025, Mr. Graham-Foy was arrested on new felony charges, including burglary, aggravated assault, and firearm possession. Doc 87-2 - Pg 1; Doc 98 - Pg 3. He was detained without bond pending trial. Doc 87-2 - Pg 1; Doc 98 - Pg 3. He has not been convicted. *State v. Graham-Foy*, No. 16-2025-CF-000297-AXXX-MA (Fla. Cir. Ct.) (case still pending).

Despite its previous position that the conditions of release were "standard" and could not possibly be modified, and that no further hearings were allowed nor possible, FCOR cleverly decided to rescind the condition for the sole purpose of trying to moot this case so that the government could evade review of its conduct. On March 27, 2025, FCOR rescinded the "No Victim Contact" condition, stating on the record that the condition no longer served its protective purpose and would not be reimposed under any circumstances during the current release term, which ends June 20, 2026. Doc 98 - Pg 4.

The district court concluded that this rescission rendered the case moot and dismissed the action on April 22, 2025. Doc 101 - Pg 1. The court also declined to exercise supplemental jurisdiction over Plaintiff's Count VI Florida Constitutional and Count VII declaratory judgment claims, without addressing those claim's embedded and explicitly stated federal constitutional issues. Doc 80 - Pg 5–7.

## III.    Standards and Scope of Review

This Court reviews *de novo* a district court's dismissal of claims for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1), including

determinations regarding standing. *See Corbett v. Transp. Sec. Admin.*, 930 F.3d 1225, 1232 (11th Cir. 2019) ("We review *de novo* a district court's dismissal of a complaint for lack of standing."); *McElmurray v. Consol. Gov't of Augusta-Richmond Cnty.*, 501 F.3d 1244 (11th Cir. 2007). When evaluating a facial attack on subject matter jurisdiction under Rule 12(b)(1)—as occurred here—the Court accepts the factual allegations in the complaint as true and draws all reasonable inferences in the plaintiff's favor, applying a standard akin to that for Rule 12(b)(6) motions. *See McElmurray*, 501 F.3d at 1251; *Lawrence v. Dunbar*, 919 F.2d 1525, 1529 (11th Cir. 1990) (*per curiam*).

Whether a case is moot is a legal question reviewed *de novo*. *See Sheely v. MRI Radiology Network, P.A.*, 505 F.3d 1173, 1182 (11th Cir. 2007); *Troiano v. Supervisor of Elections in Palm Beach Cnty.*, 382 F.3d 1276, 1282 (11th Cir. 2004). This includes assessments under the voluntary cessation doctrine and the capable of repetition yet evading review exception, which are jurisdictional inquiries subject to the same plenary standard. *See Sheely*, 505 F.3d at 1182 n.10; *Cambridge Christian Sch., Inc. v. Fla. High Sch. Athletic Ass'n*, 115 F.4th 1282, 1289 (11th Cir. 2024).

Finally, a district court's decision to decline supplemental jurisdiction over state-law claims under 28 U.S.C. § 1367(c)(1), is reviewed for abuse of discretion. *See Parker v. Scrap Metal Processors, Inc.*, 468 F.3d 733, 738 (11th Cir. 2006); *Ameritox, Ltd. v. Millennium Labs., Inc.*, 803 F.3d 518, 532 (11th Cir. 2015). However, an abuse of discretion occurs per se if the decision applies an incorrect

legal standard or rests on a legal error, such as improperly characterizing intertwined state and federal claims as purely supplemental or misapplying sovereign immunity principles. *See Aycock v. R.J. Reynolds Tobacco Co.*, 769 F.3d 1063, 1068 (11th Cir. 2014); *Ewing Indus. Corp. v. Bob Wines Nursery, Inc.*, 795 F.3d 1324, 1332–33 (11th Cir. 2015); *Lucero v. Trosch*, 121 F.3d 591, 598 (11th Cir. 1997). In such cases, the underlying legal conclusions are reviewed *de novo*. *Id.*

# SUMMARY OF ARGUMENT

The Florida Commission on Offender Review (FCOR) inflicted profound harm on Ms. Teena Foy by imposing a blanket no-contact condition as part of her son Graham-Foy's conditional release, ostensibly to "protect" her as a victim of his prior offense, despite her explicit objections and desire for reconciliation. Her status as "victim" was never sought by Ms. Foy, and she never had a say in whether it was imposed on her. But imposed on her it was, and that status ended up depriving her of the ability to embrace her son when she wanted to, and deprived her of the ability to worship with him. This is all because the FCOR uses a checklist and no real due process to make its determinations. Despite the State of Florida promising a victim's bill of rights to Ms. Foy, she received none of those rights. FCOR simply decided that she was a victim, rendered that as a punitive status, and punished *her*.

FCOR's paternalistic restriction, applied without Foy's consent or input, effectively barred Ms. Foy, a devout Catholic, from attending services due to the reasonable fear that even incidental contact with her son during Mass would violate the condition send him to jail. The harm was multifaceted: it substantially burdened her First Amendment free exercise rights by chilling her participation in essential Catholic practices, such as Mass, communal penance, and the selection of a preferred pastor and congregation, which are inherently social and non-interchangeable across parishes. Compounded by the absence of any due process, individualized assessment, or strict scrutiny, the FCOR's actions forced Ms. Foy into self-

censorship, subordinating her religious liberty to an arbitrary state policy that disrupted her spiritual life and familial bonds without compelling justification or alternatives. In short, Ms. Foy was punished by being given the choice of avoiding Mass or risking her son's incarceration. FCOR was so insistent that the two could not be together, that she was forced to remain home, rather than condemn her son to further imprisonment.

This infringement extended beyond religion, violating Ms. Foy's Fourteenth Amendment procedural due process rights and First Amendment freedom of intimate association, as the FCOR denied her an opportunity to be heard at the public hearing where the condition was imposed, despite her state-conferred rights under Florida's "Marsy's Law" to participate and waive such "protections." The district court erred in dismissing these claims, mooting the association and due process counts based on a dubious voluntary cessation by the State, and rejecting the free exercise claim for lack of standing despite Ms. Foy's well-alleged chilling injury. Furthermore, the court improperly declined jurisdiction over intertwined state constitutional claims that substantiate her federal rights under 42 U.S.C. § 1983. In declining jurisdiction, the Trial Court improperly determined that the question was purely one of state law. However, it was not – while the state law did confer Ms. Foy with certain rights, they were taken away from her without due process. This is not a dispute over whether the state law did confer certain rights, as that is not in dispute. The dispute is over the lack of due process in taking them away from her.

Ms. Graham-Foy was given the involuntary title of "victim," and because of that status, she lost the ability to associate with or worship with her son. Despite being dubbed a "victim" with the state-imposed punishments that came from it, she was stripped of rights that a "victim" should received under Marsy's Law.

Accordingly, this Court should reverse the district court's dismissal of Count II (Free Exercise), reinstate Counts I (Freedom of Association) and IV (Procedural Due Process) by rejecting mootness under the voluntary cessation doctrine and applying the capable of repetition yet evading review exception, and revive Counts VI (Deprivation of Florida Constitutional Rights) and VII (Declaratory Judgment) as integral to Ms. Foy's federal constitutional claims, ensuring full adjudication on the merits and prospective relief to prevent recurrence.

# ARGUMENT

## I. Foy Properly Established Standing for Her Free Exercise Claim

The First Amendment's Free Exercise Clause protects individuals from governmental interference in their religious beliefs and practices, including outward expressions like worship. Here, Ms. Teena Foy has shown that the FCOR's no-contact condition on her son, Graham-Foy, substantially burdened her religious exercise by barring her from attending her preferred Catholic parish, Immaculate Conception Church, due to the fear of incidental contact leading to his reincarceration. This restriction chilled her observance without individualized assessment, due process, or strict scrutiny. Thus, Ms. Foy has standing for her Free Exercise claim, and the district court's dismissal of Count II must be reversed.

To fully appreciate the gravity of this infringement, it is essential to contextualize the Free Exercise Clause within its historical and jurisprudential framework. Ratified in 1791 as part of the Bill of Rights, the Clause was designed to prevent the kind of religious persecution that drove many early settlers to America's shores. James Madison emphasized in his Memorial and Remonstrance Against Religious Assessments that "the Religion then of every man must be left to the conviction and conscience of every man; and it is the right of every man to exercise it as these may dictate."[1] This principle has evolved through Supreme Court

---

[1] James Madison, Memorial and Remonstrance Against Religious Assessments ¶ 1 (ca. June 20, 1785), in 8 The Papers of James Madison 295, 298 (Robert A. Rutland & William M. E. Rachal eds., Univ. of Chi. Press 1973), *available at* https://founders.archives.gov/documents/Madison/01-08-02-0163.

jurisprudence to protect not only overt acts of worship but also the subtler choices that define religious identity, such as selecting a spiritual community or leader. In modern times, this protection has been invoked to safeguard diverse practices, from Amish education exemptions in *Wisconsin v. Yoder*, 406 U.S. 205 (1972) (Wisconsin's compulsory school-attendance law violated the First Amendment's Free Exercise Clause as applied to Amish parents who refused on religious grounds to send their children to school beyond the eighth grade), to Native American peyote use in *Employment Division v. Smith*, 494 U.S. 872 (1990) (upholding neutral laws burdening religion unless animus shown), albeit with varying outcomes. What remains constant is the Court's insistence that government actions burdening religion must be narrowly tailored to serve compelling interests, particularly when they disrupt core aspects of faith like communal worship. The FCOR's actions exemplify such a disruption, forcing Ms. Foy into a position where her faith was subordinated to an unyielding state policy, with no regard for constitutional safeguards.

**A.** **The First Amendment Free Exercise Clause Protects Foy's Right to Choose Which Church to Attend**

At its core, the Free Exercise Clause safeguards not only religious belief but the deeply personal decision of how and where to worship[2]. As the Supreme Court articulated in *Hosanna-Tabor Evangelical Lutheran Church and School v. EEOC*, 565 U.S. 171, 186 (2012) (citing *Kedroff v. Saint Nicholas Cathedral*, 344 U.S. 94, 116 (1952)), "the freedom to select the clergy… is part of the free exercise of religion." This autonomy is not limited to institutional decisions by religious bodies; it extends to individuals' rights to affiliate with a particular congregation, pastor, or denomination. For Ms. Foy, a devout Catholic, this means the liberty to attend services at Immaculate Conception Church, where she has formed spiritual bonds and where the Mass aligns with her spiritual preferences. Denying her this choice is tantamount to compelling her to forsake a vital element of her faith, as Catholic doctrine emphasizes the irreplaceable role of the parish as a "family of families," fostering communal bonds essential to spiritual growth. This protection against state interference ensures that individuals like Ms. Foy can pursue their religious calling without fear of arbitrary governmental barriers, a principle that has been upheld in numerous contexts to preserve the diversity of religious expression in America.

---

[2] The Supreme Court has said, "[t]he Clause protects not only the right to harbor religious beliefs inwards and secretly," because it "does perhaps its most important work by protecting the ability of those who hold religious beliefs of all kinds to live out their faiths in daily life." *Kennedy v. Bremerton School District*, 597 U.S. 507, 524 (2022).

1.    **Catholic Services Are Deeply Social in Nature**

Catholic worship is inherently communal, as the Church is the Body of Christ where believers gather for sacraments strengthening collective faith. *See* Catechism of the Catholic Church, 2nd ed. (Vatican City: Libreria Editrice Vaticana, 1997) § 805. Section 10 of the Second Vatican Council's Sacrosanctum Concilium describes liturgy as the "summit" and "font" of Church activity. This is evident in the Mass, with shared prayers, hymns, and Eucharist symbolizing unity. For Ms. Foy, remote alternatives like streaming fail to replicate physical presence and sacramental grace. The FCOR's restriction forcibly severs Ms. Foy from this social fabric, imposing a burden that strikes at the heart of Catholic praxis. This social essence is not merely incidental; it is woven into the fabric of Catholic theology, where the community acts as a reflection of divine communion, making any state-imposed separation a profound infringement on religious liberty.

2.    **Certain Catholic Services, Such as the Communal Penance Service, Require Community Involvement**

Specific rites like Communal Penance demand group participation, involving collective conscience examination, shared readings, and confessions amid the assembly. Paragraph 1482 of the Catechism states that "the confession of sins… takes place within a celebration of the word of God in the midst of the assembly," highlighting its inherently social character. Catechism § 1482. For Ms. Foy, fearing contact bars her from this essential sacrament of forgiveness and grace. Similar to *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520 (1993)

(striking burdens on communal rituals), the FCOR's blanket restriction similarly disrupts Ms. Foy's ability to engage in these vital, community-dependent observances, without any tailoring to her circumstances. By ignoring these nuances, the FCOR effectively prioritizes administrative convenience over constitutional rights, a stance that courts have repeatedly rejected when it encroaches on sincere religious exercise.

3.  **Choice and Selection of Parish Is a Deeply Personal Decision, Catholic Sects Possess Broad Variation, and Different Catholic Sects Are Decidedly Not Interchangeable**

Selecting a priest and parish is intimate; shaped by doctrine, style, and ethos. Catholic parishes vary—with the starkest contract perhaps between progressive service vs. traditional Latin rites (Extraordinary Form emphasizing reverence vs. Ordinary Form's accessibility). *See Our Lady of Guadalupe School v. Morrissey-Berru*, 140 S. Ct. 2049 (2020) (reinforcing autonomy in leadership choices). For Ms. Foy, Immaculate Conception aligns with her beliefs; alternatives are not interchangeable, lacking ties or preferences vital to her faith. This non-interchangeability heightens the burden, as alternative churches may lack the historical ties or liturgical preferences that define Ms. Foy's practice. In essence, the Free Exercise Clause protects this personalized choice, preventing the state from homogenizing religious experiences under the guise of neutral policy. To illustrate, consider that even secular analogies, like preferring one bookstore over another for

its ambiance and selection, pale in comparison to the spiritual stakes here, where the choice implicates eternal salvation and moral formation.

The FCOR actually argued that Ms. Foy could simply choose a different parish. Doc 51 - Pg 10. The Anti-Catholic bias in this argument is stunning. The FCOR had the audacity to argue that of the 20 Catholic churches in the Jacksonville area, the two could simply pick different churches – as if Catholic parishes are Burger King franchises.

One Catholic church is not simply a reasonable facsimile for another. Catholics do not choose where to attend a service randomly, nor do they necessarily base it on geography, nor do they even necessarily attend the same service every week. Many "parish hop," looking to find a place that speaks to them on a given day. Saint Joan of Arc is the patron saint of prisoners, those in need of courage, and those persecuted for their faith. With all three conditions requiring intercession in this case, if there were a mass at a particular church to honor St. Joan, based on their religion, both Plaintiff and her son would naturally gravitate there. However, FCOR's position is that only one could attend.

The patron saint of judges is St. John of Capistrano. It is not unlikely that Plaintiff and her son could find themselves praying for the Court at the same place at the same time. In short, the number of churches available to them does not affect the chances of attending the same mass. However, Defendants believe that even if they wish to pray at the same mass, kneel before the same altar, and pray to the same

saint at the same time, the State of Florida harbored a pathological hatred of the thought of them doing so.

Defendants argued that even if Foy and Graham-Foy happened to find themselves at the same church, it would not have been a *knowing* violation. However, this ignores the result—no matter what, one of the two would immediately have to leave, because the moment they saw each other, the unknowing violation becomes a knowing one. Forcing Plaintiff to leave were she to happen upon a mass attended by her son violates her free exercise rights, and there is no legitimate interest under any test, Turner or otherwise, for this restriction.

FCOR could have mooted this issue with a reasonable accommodation – and indeed such was requested. *See* Doc 1 - Pg 21. However FCOR was so intransigent that they would not even bend to permit Ms. Foy and Mr. Graham-Foy to sit in the same church together, once a week. Ms. Foy was forced, by the government, to choose between her own spiritual well-being and that of her son. [3]

---

[3] This is even more stunningly ignoble when we examine the voluntary cessation that the FCOR engaged in, for the transparent purpose of evading review of their actions. Where FCOR would not even allow the two to be in the same courtroom, *remotely*, they now take the position that they are no longer interested in any of the restrictions they imposed. If the government is permitted to play "hide and seek" with the Constitution, as long as they can violate it, then engage in voluntary cessation to avoid any consequences, do we even have a Constitution?

## B. The FCOR's Actions Terminated Foy's Capacity to Make This Determination, and Foy Was Not Afforded Any Due Process

The FCOR's imposition of the no-contact condition on Graham-Foy's conditional release, without an exception for religious services, directly undermined Ms. Foy's ability to exercise her religious autonomy, creating an insurmountable barrier to her worship without any procedural safeguards. This action constitutes a substantial burden on her Free Exercise rights, necessitating strict scrutiny. The federal Religious Freedom Restoration Act, 42 U.S.C. § 2000bb *et seq.*, (RFRA) does not apply to state actions under *City of Boerne v. Flores*, 521 U.S. 507 (1997). However, its strict scrutiny framework, as elucidated in *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418 (2006), offers persuasive guidance for First Amendment analysis, particularly where neutral laws incidentally burden religion. In *O Centro*, the Supreme Court emphasized that even broadly applicable laws must be evaluated for their specific impact on religious claimants, rejecting categorical justifications in favor of individualized assessments. Applying this persuasive logic here, the FCOR's no-contact rule cannot be justified abstractly; it must be scrutinized for its impact on Ms. Foy's faith, which demands communal worship potentially shared with her son.

The reasoning in *O Centro* is instructive as a model for constitutional interpretation. The government there argued that exempting a small religious group from the Controlled Substances Act would undermine uniform drug enforcement and international obligations. Yet the Court demanded concrete evidence of harm,

finding none of the justifications offered by the government sufficient to outweigh the burden on the group's sacramental use of hoasca (also called ayahuasca). Similarly, the FCOR offers no individualized evidence that allowing Ms. Foy and her son to attend the same church poses a genuine risk. Their faith requires participation in community sacraments, yet the restriction bars this without assessing alternatives, such as supervised contact or parish notifications. This categorical approach echoes the overbreadth critiqued in *O Centro*, where the Court noted the need to apply compelling interest tests "to the person"—the particular claimant whose sincere exercise of religion is being substantially burdened. *Id.* at 430–31. Although RFRA itself is not binding on Florida, this individualized approach aligns with First Amendment principles post-*Employment Division*, especially in hybrid-rights cases involving family and religion, and should inform the analysis here. The condition was imposed automatically, without input from Ms. Foy, who neither requested nor consented to this "protection," highlighting the lack of tailoring.[4]

---

[4] Florida's own Religious Freedom Restoration Act (RFRA), codified at Fla. Stat. § 761.01 *et seq.*, directly applies to this state action and mandates the same strict scrutiny standard as its federal counterpart. Enacted in 1998 to fill the gap left by *Boerne*, Florida's RFRA prohibits state agencies like the FCOR from substantially burdening religious exercise unless the burden furthers a compelling governmental interest and is the least restrictive means—language mirroring the federal statute. *See* Fla. Stat. § 761.03. Given the statutes' shared purpose, definitions (e.g., broad protection for any "act or refusal to act" motivated by sincere belief), and remedies, federal precedents like *O Centro* provide interpretive guidance for Florida courts, which routinely align state RFRA analyses with federal jurisprudence. Here, the no-contact condition fails this test, as the FCOR has not

Moreover, the absence of due process exacerbates the violation. The Fourteenth Amendment guarantees notice and an opportunity to be heard before deprivation of liberty interests, including those intertwined with First Amendment rights. In *Mathews v. Eldridge*, 424 U.S. 319 (1976), the Court outlined factors for due process: the private interest affected, the risk of erroneous deprivation, and the government's burden. Ms. Foy's interest in religious exercise is profound, the risk of error high given the lack of hearing, and the government's burden minimal— merely allowing a waiver or contestation mechanism. Without this, the FCOR effectively silenced her voice, imposing a spiritual exile. Cases like *Fulton v. City of Philadelphia*, 593 U.S. 522 (2021), where foster care policies burdening religious agencies were scrutinized for lacking exemptions, underscore that discretionary systems without safeguards invite Free Exercise violations. The FCOR's failure to provide any process renders the burden even more egregious, as Ms. Foy could not advocate for her faith or propose accommodations. This procedural deficit not only offends due process but also undermines the trust in government neutrality toward religion, a foundational aspect of the minimal state interest here pales against the religious harm. Unlike the national security concerns in *O Centro*, permitting shared

---

demonstrated concrete harm or explored less restrictive alternatives, such as faith-based accommodations. Unlike the federal RFRA's post-*Boerne* limitation to national actions, Florida's law explicitly governs state subdivisions, ensuring robust protection against burdens like this one without exceptions relevant to conditional release conditions.

worship threatens no broader public policy; it merely requires forgoing a non-essential restriction. Ms. Foy seeks not to evade law but to lift an involuntary punitive status imposed on her (despite her doing nothing to deserve it), aligning with persuasive RFRA-like principles of accommodation. In *Little Sisters of the Poor Saints Peter and Paul Home v. Pennsylvania*, 140 S. Ct. 2367 (2020), the Court upheld exemptions from contraception mandates, emphasizing deference to religious burdens. Here, too, the FCOR is not bound by federal RFRA, but the First Amendment's logic demands justification for why less restrictive means, like time-specific attendance or mediation, were not explored. Absent such justification, the action fails the strict scrutiny that courts apply to substantial burdens on religion, warranting reversal.

### C. Foy's Alleged Fear Was Sufficient to Create Standing

Ms. Foy has articulated a concrete, particularized injury sufficient for Article III standing: a chilling effect on her religious exercise stemming from the no-contact condition's threat of enforcement. She refrained from attending Mass at her parish due to a reasonable fear that coincidental contact with her son could violate his conditional release, leading to his reincarceration—an outcome she dreads as both a mother and a believer. This fear is grounded in objective facts: their shared Catholic upbringing, geographic proximity, and the parish's centrality to her faith. Unlike speculative harms, this chill represents self-censorship akin to recognized First Amendment injuries.

23

The Supreme Court has consistently held that government actions inducing self-censorship through credible threats confer standing. In *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159–61 (2014), plaintiffs challenged a law prohibiting false political statements, alleging intent to engage in protected speech, arguable proscription, and a threat of enforcement, resulting in self-censorship as injury. Ms. Foy parallels this: she intends to worship, the condition arguably proscribes shared attendance, and enforcement is credible, prompting abstention. This injury is traceable to the FCOR and redressable by invalidating the condition.

Distinguishing from cases like *Laird v. Tatum*, 408 U.S. 1, 13–14 (1972), where subjective chills from surveillance lacked objective penalties, Ms. Foy's fear is tied to tangible repercussions. In *Clapper v. Amnesty Int'l USA,* 568 U.S. 398, 410 (2013), the Court required "certainly impending" harm but allowed standing for reasonable self-restrictions avoiding risks. Here, the chain is direct. Extending to Free Exercise, *Sherbert v. Verner*, 374 U.S. 398, 404–06 (1963), found burdens when policies forced choices between faith and benefits. Post-Smith, hybrid rights or animus trigger scrutiny, as in *Fulton* and *O Centro*. Although *O Centro* arose under federal RFRA, which does not bind states per *Boerne*, its emphasis on substantial burdens provides persuasive insight into First Amendment protections against indirect coercions. In *303 Creative LLC v. Elenis*, 600 U.S. 570 (2023), pre-enforcement chilling effects sufficed for speech claims; analogously, Ms. Foy's anticipatory harm warrants review.

Eleventh Circuit precedents reinforce this. In *Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1119-20 (11th Cir. 2022), self-censorship from speech policies established standing due to reasonable fear. *Wollschlaeger v. Governor of Florida*, 848 F.3d 1293, 1304–05 (11th Cir. 2017), recognized chilling effects from disciplinary threats. In free exercise, *Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1227 (11th Cir. 2004), found burdens under 42 U.S.C. § 2000cc *et seq.*, the Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA), where zoning laws forced relocations. Ms. Foy's dilemma—alter worship or risk harm to her son—mirrors these, demanding scrutiny.

In conclusion, the chilling effect on Ms. Foy's Free Exercise rights—clearly alleged and supported by precedent—satisfies the requirements for standing and underscores the need for reversal.

### D. The District Court's Reliance on Graham-Foy's Unknown Piety Does Not Undo Foy's Reasonable Fear

The district court erred in dismissing Ms. Foy's Free Exercise claim by framing the injury as contingent on her son's uncertain church attendance. That framing mischaracterizes the nature of the harm. The injury does not arise from Graham-Foy actually attending Mass and being reincarcerated; it arises from Ms. Foy's present, credible fear that attending church may cause a violation of the no-contact condition—resulting in her actions causing her son's reincarceration. This fear, plausibly and specifically alleged, chilled her religious exercise and altered her behavior. That is sufficient to establish injury in fact under *Driehaus*, where the

Court held that a self-censorship injury caused by a credible threat of enforcement satisfies Article III. *See Driehaus,* 573 U.S. at 161–64.

The complaint includes detailed supporting allegations: Graham-Foy was raised Catholic (Doc 43-12 - Pg 3) and thus taught to seek out the church in times of transition and need, and his residence was proximate to Immaculate Conception, where Ms. Foy enjoyed worshipping. *Id.* - Pg 8-9. Without the ability to communicate with her son, Ms. Foy would run the risk of causing her son's incarceration any time she might visit Immaculate Conception, which, given its location, was a likely place for him to worship.

These allegations are not speculative—they establish a real, personal religious constraint caused by state action. But for the condition, she would attend Mass. Because of it, she feared attending Mass. That suffices for injury; the court's demand for further factual support about Graham-Foy's future religious intentions imposes a higher burden than Rule 12 permits. At the pleading stage, a plaintiff must allege facts rendering injury plausible, not prove it with certainty. *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007) (requiring "sufficient factual matter, accepted as true," to support a "plausible" claim).

Nor does *Swann v. Secretary, Georgia*, 668 F.3d 1285 (11th Cir. 2012), justify dismissal. The primary injury here is not the product or byproduct of third-party conduct, but of the FCOR's condition and its chilling effect on Ms. Foy's exercise of religion. It is the existence and enforcement of the FCOR's condition that causes

her to abstain from worship. This direct link between government-imposed restrictions and the chilling of constitutionally protected conduct satisfies traceability. *See Driehaus*, 573 U.S. at 162–63.

To the extent the court dismissed the claim because it declined to "speculate" about Graham-Foy's future behavior, it improperly substituted speculation for plausibility. The fear alleged is Ms. Foy's, and it is real, specific, and grounded in the coercive power of the State. That is enough. The First Amendment does not require citizens to prove the precise mechanics of their future harm before they are allowed into court to vindicate chilled rights.

### E. The Visitation of the Earthly Harm on Graham-Foy Does Not Mitigate the Separate Spiritual Harm on Foy

The burden on Ms. Foy remains substantial even though the penalty targets her son, as indirect coercions violating religious conscience are cognizable. Supreme Court cases like *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 724 (2014), held under RFRA, owners' complicity in perceived immorality via insurance mandates burdened exercise. Courts defer to sincere beliefs. In *O Centro*, enforcement preventing sacraments burdened Free Exercise despite much deeper public implications, focusing on the claimant's choice.

Ms. Foy faces an analogous moral quandary: worship risks complicity in her son's harm, violating her faith and maternal duty. This indirect pressure, like Damocles' sword, induces abstention. Precedents like *Yoder*, where parental rights intersected with religion, show that indirect burdens may suffice. The Constitution

bars states from leveraging family ties to deter religious conduct, protecting against moral or emotional harms.

The district court overlooked this, undervaluing how burdens manifest through loved ones. Reversal ensures full and faithful Free Exercise protection.

## II. The District Court improperly applied the voluntary cessation doctrine to Foy's Freedom of Association and Procedural Due Process Claims

The district court erred in dismissing Ms. Foy's Freedom of Association (Count I) and Procedural Due Process (Count IV) claims as moot, misapplying the voluntary cessation doctrine by presuming Defendants' removal of the no-contact condition rendered the controversy non-justiciable without rigorous scrutiny. Doc 101 - Pg 4–7. A government defendant's voluntary policy shift moots a case only if they satisfy the "formidable burden" of proving it is "absolutely clear" the challenged conduct cannot reasonably recur, assessed through three factors: substantial deliberation, permanent and complete cessation, and consistent commitment to the change. *FBI v. Fikre*, 601 U.S. 234, 241 (2024); *Cambridge Christian Sch., Inc. v. FHSAA*, 115 F.4th 1282 (11th Cir. 2024). The court overlooked Defendants' opportunistic exploitation of Graham-Foy's arrest, the conditional scope of the removal, and their unrenounced restrictive intent, while ignoring Foy's ongoing victim status as a persisting burden.

Furthermore, even if the voluntary cessation in this case is found to be sufficient to moot the case, this situation lies squarely with the capable of repetition yet evading review exception, thus preserving the claims. Conditional release terms

can be inherently short, evading full litigation, while recurrence is likely for Foy and similarly situated victims under FCOR's paternalistic policy. Reversal is required for merits adjudication and permanent relief through June 2026 and beyond.

## A. Defendants Have Not Met the *Cambridge Christian School* Factors

Defendants' March 27, 2025 vote to remove the no-contact condition, explicitly linked to Graham-Foy's temporary detention, fails all three *Cambridge Christian* factors, contrary to the district court's acceptance of their assurances. Doc 99-1 - Pg 1; Doc 99-2 - Pg 1.

## 1. The Change Was Not Due to "Substantial Deliberation" but Rather Was Prompted by a Cynical Attempt to Capitalize on Graham-Foy's Actions.

The district court dismissed manipulation concerns by deeming Graham-Foy's arrest an "independent" trigger, but the vote's timing—shortly after the arrest, amid pending summary judgment, and during a time when FCOR expressed concerns about the availability of attorneys' fees, Doc. 86 - Pg 5,—reveals an opportunistic ploy to exploit events rendering contact impossible, not genuine deliberation. Doc 101 - Pg 6; Doc 99-1 - Pg 3–4 (tying removal to detention as "materially changed circumstances"). Defendants continuously maintained that the removal of the condition was "impossible," yet acted only when litigation loomed and incarceration mooted immediate harm, a clever yet cynical gambit to evade review. Doc 100 - Pg 2. *Cambridge Christian Sch.* rejects mootness where cessation aligns with external events manipulated for jurisdictional gain, emphasizing

substance over chronology. 115 F.4th at 1284.  Absent evidence of pre-arrest review or policy shift, this lacks "substantial deliberation." *United States v. W.T. Grant Co.,* 345 U.S. 629, 632 (1953) (expedient timing suspect).

## 2. The Decision to End the Conduct Cannot Reasonably Be Viewed as Sincerely Being Permanent and Complete.

The court erroneously viewed the removal as "unambiguous, permanent, and complete," ignoring its express limitation to the "current term" ending June 20, 2026, and vulnerability to "changed circumstances" like charge dismissal. Doc 101 - Pg 5–6; Doc 99-2 - Pg 1; Doc 99-1 - Pg 5–6 (odds "approach zero" but contingent on detention). If Graham-Foy resolves charges favorably pre-2026, reinstatement remains possible under FCOR rules permitting modifications. Doc 99 - Pg 8–9; Doc 100 - Pg 5. *Fikre* held such conditional assurances insufficient, requiring proof against future equivalents. 601 U.S. at 242. Defendants offer no irrevocable disavowal of "functionally identical" barriers post-2026, rendering the cessation incomplete. *Cambridge Christian Sch.*, 115 F.4th at 1285 (demanding permanence, not pauses).  Indeed, the "no contact with victim" condition is a generic code— E33—on the conditional release form, Doc. 43-4 - Pg. 3, and as the district court judge recognized, it is a condition that is regularly imposed in similar cases.  *See* Doc. 41 - Pg 105.  Further, Ms. Graham-Foy is still deemed a "victim," and the FCOR has not at all admitted nor intimated that she would no longer be subject to punitive actions, based on that status.

**3.  The Government Has Consistently Maintained Its Intent to Impose These Restrictions in the Face of All Reason.**

Defendants' paternalistic view of non-waivable victim protections persists, belying any "consistent commitment" to change, yet the court presumed otherwise without addressing their rationale. *Cambridge Christian Sch.*, 115 F.4th at 1285; Doc 101 - Pg 6.  The continued imposition of the "no contact with victim" provision was so important to FCOR that intervened in Mr. Graham-Foy's state court proceedings after he successfully petitioned that court to have the condition removed. Doc 43 - Pg 13; Doc 43-8 - Pg 2; Doc 43-9 - Pg 8.  Then, in the district court, FCOR opposed any and all forms of contact between Ms. Foy and her son, *including the parties having concurrent courtroom presence remotely* lest some furtive exchange of communication between them occur.  Doc 17 - Pg 2; Doc 19 - Pg 2; Doc 20 - Pg 2-3.  This unyielding intent—rooted in a desire to impose mandatory separation—endures, as the removal assumes recurrence unlikely only while Graham-Foy is jailed. Doc 99 - Pg 8–9. The court overlooked this consistency, improperly shifting the burden. *Fikre*, 601 U.S. at 241 (past conduct informs future risk).

**B.  The Vast Weight of the Defendants Actions Demonstrate That They Strongly Desire to Prevent Foy and Graham-Foy from Having Any In-Person Contact, and Defendants Are Likely to Reimpose the Restrictions at the Earliest Opportunity**

Defendants' litigation history and policy stance evince a strong desire to block contact, creating a reasonable likelihood of reimposition upon *any* opening, which

the district court dismissed as "remote" speculation. Doc 101 - Pg 7. They enforced total separation, limited injunction relief to monitored remote interactions, opposed even silent proximity during this very action, and even required Ms. Foy to leave the courtroom while her son testified via remote means. Doc 20 - Pg 1–2; Doc 21 - Pg 1–2; Doc 100 - Pg 6. Removal of the condition occurred only post-arrest,[5] once contact was infeasible, and they concede contingencies for reinstatement if charges drop or supervision evolves. Doc 99 - Pg 8–9; Doc 99-1 - Pg 6. *Troiano v. Supervisor of Elections*, 382 F.3d 1276, 1283 (11th Cir. 2004), evaluates recurrence by practical realities, not assurances. *Fikre* mandates viewing the record holistically, where Defendants' "prior litigation conduct belies [their] current assurances." 601 U.S. at 241; Doc 100 - Pg 8–9. Absent permanent injunction, reimposition is likely pre- or post-2026, necessitating reversal to secure Foy's rights.

Even if voluntary cessation applied, the capable of repetition yet evading review exception preserves the claims. This applies when (1) duration is too short

---

[5] While not controlling, the irrational nature of FCOR's intransigence is worth considering. Post-incarceration family contact improves convicts' mental health, helps them successfully re-enter society, and reduces the chances of their recidivism. Doc 55 - Pg 2, *see also* Doc 43 - Pg 11–12. FCOR seems to delight in the fact that Mr. Graham-Foy is in pretrial detention for a crime he has not yet been convicted of. But if he is a recidivist, perhaps had FCOR permitted post-incarceration family contact, he would not have been in a position to do so. They set him up to fail, and they now wish to have no accountability for violating Ms. Foy's Constitutional rights while doing so.

for full litigation, and (2) reasonable recurrence expectation exists. *Roe v. Wade*, 410 U.S. 113, 125 (1973); *FCC v. Consumers' Rsch.*, 144 S. Ct. 2102, 2108 (2024).[6]

Conditional releases are often too short for complete review, like *Roe*'s gestation or FCC's quarterly payments, often expiring pre-appeal. Doc 42 - Pg 6; Doc 100 - Pg 7 (citing *Turner v. Rogers*, 564 U.S. 431, 440 (2011), for short incarcerations). Recurrence is expected: Graham-Foy's charges may resolve without revocation, enabling reimposition, or future terms could reinstate under FCOR's policy prioritizing non-waivable "protection" over consent. Doc 100 - Pg 7–8; Doc 99 - Pg 8–9. As in *Roe*, where pregnancies recur, supervision cycles repeat. 410 U.S. at 125. FCOR's stance affects not just Foy but others in familial victim-offender situations, denying waivers and imposing short-term burdens evading review— underscoring public interest in adjudication. *Turner*, 564 U.S. at 440. The exception applies, warranting reversal.

### C. Foy's Victim Status Is a Governmentally Assigned Infirmity, Not Subject to Mootness

When Marsy's Law passed, presumably "victim" status was intended to be a status granting privileges to those bearing the title. Perhaps due process is not required when *conferring* benefits. However, in this case, the FCOR found a way to make "victim" status *punitive*. A citizen deserves due process before being

---

[6] We note that wile *Dobbs v. Jackson Women's Health Org.,* 597 U.S. 215 (2022) overruled the substantive right aspects of *Roe*, it left the mootness doctrine aspects unaddressed.

saddled with any punitive status, and should enjoy due process to purge themselves of that status if they deserve to. Ms. Foy received none of this due process.

The district court ignored Foy's non-consensual victim designation as an ongoing infirmity burdening her rights, sustaining the controversy despite the temporary removal. The vote altered only the condition, not Foy's status under Florida's Victims' Rights provision, which Defendants deem unwaivable and justifying separation from her son and her religion, against her will. Doc 100 - Pg 5; Doc 99-1 - Pg 4 (implicit in rationale). Foy seeks declaratory relief to "shed" this label and affirm opt-out rights, unaddressed and enabling future restrictions in new contexts, like post-2026 release or related proceedings. Doc 42 - Pg 9; Doc 42 - Pg 21. *Fikre* held persisting statuses preclude mootness if recurrence is plausible. 601 U.S. at 242. The "capable of repetition" exception applies: short-term impositions evade full review, and repetition is likely per Defendants' policy. *Turner*, 564 U.S. at 440. Without judicial removal, this infirmity perpetuates harms, requiring reversal for lasting relief. A citizen should have the right to shed "victim" status if it becomes a punitive designation.

### D. Avoiding an Award of Attorneys' Fees was the Primary Factor that Drove FCOR to Attempt to Moot the Case.

Although FCOR maintained that it removed the no-contact provision because it was "no longer furthering its initially intended purpose," Doc. 99 – Pg 4, the real reason it removed the condition was to moot the action and thereby avoid an award of attorneys' fees at its conclusion. This is evident from its own motion to stay the

proceedings so the Supreme Court could render a decision in the then-pending case *Lackey v. Stinnie*, 145 S. Ct. 659 (2025).

Specifically, FCOR advised the district court that the "only remaining question to be resolved by this Court . . . is Plaintiff's entitlement to attorneys' fees pursuant to 28 U.S.C. § 1988 for having obtained a preliminary injunction prior to her claims becoming moot." Doc. 86 - Pg 5. The startling admission gave away the game. FCOR's real concern was not about the necessity *vel non* of continuing to impose the challenged condition; it was considerable sum of money it would have to pay at the end of the case.

## III. The Court erred dismissing counts VI and VII because the claims are intertwined with federal constitutional rights under 42 U.S.C. § 1983

The district court erred in dismissing Counts VI and VII under 28 U.S.C. § 1367(c)(1), as those counts did not constitute standalone state-law claims but were inextricably intertwined with Ms. Foy's federal constitutional rights under the First and Fourteenth Amendments, enforceable through 42 U.S.C. § 1983. As explicitly pled in paragraphs 94 and 105 of the Second Amended Complaint, the alleged violations of Article I, § 16 of the Florida Constitution "simultaneously" infringed Ms. Foy's federal rights, effectively merging the state provisions with federal guarantees to form a cohesive § 1983 claim. This merger elevates what might superficially appear as novel state-law issues into core elements of Ms. Foy's federal claims, such that the district court's characterization of Counts VI and VII as purely supplemental state matters was a fundamental legal misstep.

This mischaracterization rendered the dismissal an abuse of discretion premised on an error of law. As this Court has consistently held, a district court's decision to decline supplemental jurisdiction is reviewed for abuse of discretion, but such abuse occurs per se when the decision applies an incorrect legal standard or rests on a legal error. *See Aycock v. R.J. Reynolds Tobacco Co.*, 769 F.3d 1063, 1068 (11th Cir. 2014) ; *Ewing Indus. Corp. v. Bob Wines Nursery, Inc.*, 795 F.3d 1328, 1332–33 (11th Cir. 2015) (explaining that "[a] district court abuses its discretion if it applies an incorrect legal standard" and that "[a]n error of law is an abuse of discretion per se"). Where, as here, the error involves a flawed legal premise—such as improperly treating intertwined claims as subject to *Pennhurst* rather than recognizing their federal nexus—the underlying question warrants *de novo* review. *See Lucero v. Trosch*, 121 F.3d 591, 598 (11th Cir. 1997) (holding that while supplemental jurisdiction decisions are reviewed for abuse of discretion, "the conclusion that the state law claims must be dismissed because they are preempted by federal law is a legal conclusion that we review *de novo*"); *Ameritox, Ltd. v. Millennium Labs., Inc.*, 803 F.3d 518, 532 (11th Cir. 2015) (reversing for abuse where the district court applied "an incorrect legal standard" in assessing supplemental jurisdiction over complex state claims entangled with federal issues, emphasizing that such errors constitute "a clear error of judgment").

Moreover, the facts detailed in Ms. Foy's declaration reinforce this federal dimension, demonstrating that the Commission's actions deprived her of a state-

created liberty interest without due process, thereby independently violating the Fourteenth Amendment apart from any freestanding state claim.

For these reasons, this Court should reverse the district court's dismissal of Counts VI and VII.

### A. The Florida Constitutional Provisions Form an Integral Part of Ms. Foy's Federal Claims

Counts VI and VII are not freestanding invocations of Florida law but serve to define and substantiate the scope of Ms. Foy's federally protected interests. Under well-established precedent, state law may establish liberty or property interests that trigger federal due process protections or inform the analysis of other constitutional rights. *See Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972) (state law sources can create interests protected by the Fourteenth Amendment). Here, Florida's Marsy's Law (FLA. CONST. art. I, § 16(b)) confers upon crime victims rights to due process, fairness, dignity, and—upon request—the right to be heard at public proceedings involving parole or release conditions. Ms. Foy's declaration establishes that she was present at the Commission's public hearing on her son's conditional release, attempted to speak in objection to the "No Victim Contact" condition, but was cut off and informed that the public was not allowed to participate. This denial directly implicated her state-conferred rights, which in turn burdened her First Amendment right to intimate familial association and her Fourteenth Amendment due process rights.

For instance, in Count IV (procedural due process), Ms. Foy contends she was deprived of a liberty interest without adequate process. The Florida Constitution provides the predicate interest: a victim's right to due process and to be heard at public parole hearings. *See* FLA. CONST. art. I, § 16(b)(1), (6)(b), (granting "the right to due process" and, upon request, "the right to be heard in any public proceeding involving ... parole") . Ms. Foy's presence at the hearing and thwarted attempt to speak constituted a request to be heard, yet the Commission summarily denied her that opportunity, imposing the no-contact condition without recourse. This deprivation of a state-created liberty interest without notice or a meaningful chance to object violates federal procedural due process under § 1983. *See Kentucky Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989) (state law can create liberty interests in prison contexts if it places substantive limitations on official discretion. Similarly, Count I (intimate association) is strengthened by Florida's recognition of victim autonomy and dignity; the Commission's refusal to respect Ms. Foy's waiver and expressed desire for contact arbitrarily infringed her fundamental right to family relationships. *See Roberts v. U.S. Jaycees*, 468 U.S. 609, 619-20 (1984) (protecting choices central to personal dignity, including family associations); *McCabe v. Sharrett*, 12 F.3d 1558, 1563 (11th Cir. 1994) (strict scrutiny applies to burdens on intimate associations). By dismissing Counts VI and VII, the district court severed these intertwined elements, leaving Ms. Foy's federal claims incomplete and unaddressed in their full scope. This mischaracterization of the claims as purely

supplemental state issues was a legal error, as they arise from the "same case or controversy" as the federal questions under 28 U.S.C. § 1331. *See United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 725 (1966) (federal jurisdiction extends to claims sharing a common nucleus of operative fact). The Commission's actions at the public hearing independently offend the Fourteenth Amendment by depriving Ms. Foy of due process in a manner that does not require direct enforcement of state law but merely recognizes the state-created interest as the foundation for federal protection.

**B.    The Eleventh Amendment and *Pennhurst* Do Not Bar Consideration of the State Provisions in This Federal Context**

The district court's invocation of *Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89 (1984), and concerns about sovereign immunity was misplaced, as Ms. Foy seeks relief grounded in federal law, not enforcement of state law against the state. *Pennhurst* prohibits federal courts from ordering state officials to comply with state law, *id.* at 106, but it does not preclude incidental examination of state law when it informs a federal constitutional violation. *See Brown v. Ga. Dep't of Revenue*, 881 F.2d 1018, 1023 (11th Cir. 1989) (Eleventh Amendment permits relief "ordered pursuant to . . . federal law," even if state law is involved). The "determinative question" is the basis for relief: here, any injunction or declaration would rest on violations of the First and Fourteenth Amendments, with Florida's victims' rights provisions serving merely as evidence of the arbitrariness or lack of process in Defendants' actions. Ms. Foy's declaration underscores this:

the Commission's refusal to let her speak at the public hearing—despite her presence and attempt to object—deprived her of a liberty interest in being heard, as defined by state law, without due process, thereby violating federal guarantees independently.

This Court has consistently allowed such integrated analyses. In *Warren v. DeSantis*, 90 F.4th 1115, 1144 n.1 (11th Cir. 2024) (Newsom, J., concurring), Judge Newsom cautioned against gratuitous commentary on state law unrelated to federal relief. But unlike *Warren*, where state-law observations were advisory and unnecessary, Ms. Foy's claims require engagement with Article I, § 16 to resolve the federal issues—e.g., to determine if she possessed a protected interest in participating at the hearing that Defendants ignored, thereby shocking the conscience or unduly burdening association. *See Ex parte Young*, 209 U.S. 123, 159–60 (1908) (permitting prospective relief against state officials for federal violations). Federal courts routinely interpret state law preliminarily in § 1983 cases without implicating *Pennhurst*, such as when assessing property interests for due process claims. *See Roth*, 408 U.S. at 577. Dismissing Counts VI and VII outright avoided this permissible inquiry, artificially narrowing Ms. Foy's federal claims and contravening the principle that *Pennhurst* does not bar relief for "federal constitutional wrongs" merely because the conduct also offends state law. *Brown*, 881 F.2d at 1023. The hearing facts establish an independent federal violation: even

assuming arguendo the state right to be heard, the Commission's cutoff deprived Ms. Foy of process owed under the Fourteenth Amendment.

## C.     The Dismissal Was an Abuse of Discretion Under § 1367(c)(1)

Even assuming Counts VI and VII involved novel state issues, the district court's blanket refusal to exercise jurisdiction was an abuse of discretion, as it failed to account for their entanglement with federal claims and the resulting prejudice to Ms. Foy. This Court reviews a district court's decision to decline supplemental jurisdiction under 28 U.S.C. § 1367(c)(1),  for abuse of discretion. *See Parker v. Scrap Metal Processors, Inc.*, 468 F.3d 733, 738 (11th Cir. 2006). However, such an abuse occurs *per se* when the decision rests on an error of law, such as mischaracterizing intertwined state and federal claims as purely supplemental state matters subject to declination. *See Ewing Indus. Corp.*, 795 F.3d at 1332–33 ("A district court abuses its discretion if it applies an incorrect legal standard" and "[a]n error of law is an abuse of discretion per se."); *Ameritox*, 803 F.3d at 532 (reversing for abuse where the district court applied "an incorrect legal standard" in assessing supplemental jurisdiction over complex state claims entangled with federal issues). In these circumstances, the underlying legal premise—here, the flawed characterization of Counts VI and VII and the inappropriate application of *Pennhurst*—warrants *de novo* review. *See Lucero*, 121 F.3d at 598 (11th Cir. 1997) (while supplemental jurisdiction decisions are reviewed for abuse of discretion, legal

conclusions underpinning dismissal, such as preemption or jurisdictional characterizations, are reviewed *de novo*).

Section 1367(c)(1), allows declination for novel or complex state claims, but discretion must be exercised judiciously, considering judicial economy, convenience, fairness, and comity. *Gibbs*, 383 U.S. at 726. Here, the claims share the same factual core as the federal counts: Defendants' imposition of the no-contact condition at a public hearing where Ms. Foy was denied participation in the face of a clear Florida Constitutional provision granting her a right to participate.

The prejudice is stark: without these counts, Ms. Foy lost the ability to argue that Defendants' disregard of her state-conferred autonomy and right to be heard rendered their actions unconstitutional under federal standards. *See Doe v. Moore*, 410 F.3d 1337, 1343 (11th Cir. 2005) (evaluating restrictions on association for rationality or compelling interest). The hearing deprivation independently supports a federal due process claim, as the Commission's actions denied her a meaningful opportunity to protect her liberty interest in familial association. Retaining jurisdiction would have promoted efficiency, as the Florida provisions directly bear on the federal analysis, and posed no undue comity concerns given the federal overlay. The district court's overbroad application of § 1367(c)(1), influenced by an inapposite reading of *Pennhurst* and *Warren*, thus exceeded its discretion. This Court should reverse the district court's dismissal of Counts VI and VII and remand for merits consideration as merged with Ms. Foy's § 1983 claims.

## CONCLUSION

The FCOR's imposition of a blanket no-contact condition on Graham-Foy's conditional release, without Ms. Foy's consent, or any procedural safeguards, inflicted a profound and multifaceted harm by substantially burdening her First Amendment free exercise rights, chilling her ability to worship at her chosen Catholic parish due to the fear of incidental contact and her son's reincarceration. This paternalistic overreach, devoid of individualized assessment, strict scrutiny, or due process, not only disrupted her deeply communal religious practices—essential to Catholic theology—but also violated her freedom of intimate association and procedural due process under the Fourteenth Amendment, while stripping her of rights conferred to her under Florida's Marsy's Law. The district court's errors in dismissing her free exercise claim for lack of standing, mooting her association and due process claims under a misapplied voluntary cessation doctrine without considering the capable of repetition exception, and declining jurisdiction over intertwined state claims as purportedly novel issues, demand reversal to vindicate these core constitutional protections.

This Court should reverse the dismissal of Count II and remand for application of strict scrutiny; reject mootness for Counts I and IV, applying the voluntary cessation factors and evading-review exception to ensure merits adjudication; and reinstate Counts VI and VII as integral to Ms. Foy's federal § 1983 claims, granting declaratory and injunctive relief to prevent future recurrence and affirm that

religious liberty and familial autonomy cannot be subordinated to unyielding state policies absent compelling justification.

Dated: July 30th, 2025                    Respectfully submitted,

/s/ Marc J. Randazza
 Marc J. Randazza            Andrew B. Greenlee          Carrie Goldberg
 FL Bar No. 625566           FL Bar No. 96365            *Pro Hac Vice*
 RANDAZZA LEGAL              ANDREW GREENLEE, P.A.       C.A. GOLDBERG, PLLC
 GROUP, PLLC                 401 E. 1st Street, Unit 261  16 Court Street, 33rd Floor
 2 S. Biscayne Blvd,         Sanford, FL 32772           Brooklyn, NY 11241
 Suite 2600                  (407) 808-6411              Tel: (646) 666-8998
 Miami, FL 33131             Andrew@Greenleelaw.com      carrie@cagoldberglaw.com
 (888) 887-1776
 ecf@randazza.com

                             *Attorneys for Plaintiff*

**CERTIFICATE OF SERVICE**

I hereby certify that on July 30th, 2025, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eleventh Circuit by using the CM/ECF system.  I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/ Marc J. Randazza
Marc J. Randazza,
FL Bar No. 625566
RANDAZZA LEGAL GROUP, PLLC
2 S. Biscayne Blvd,
Suite 2600
Miami. FL 33131
Tel: (888) 887-1776
ecf@randazza.com

*Counsel for Plaintiff*

# CERTIFICATE OF COMPLIANCE

1.     This document complies with the type-volume limit of Fed. R. App. P.

32(a)(7), (g) because excluding the parts of the document exempted by Fed.

R. App. P. 32(f), this document contains X words, which is less than the

maximum of 13,000 words.

2.     This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman.

Dated:  July 30, 2025

/s/ Marc J. Randazza
Marc J. Randazza,
FL Bar No. 625566
RANDAZZA LEGAL GROUP, PLLC
2 S. Biscayne Blvd,
Suite 2600
Miami. FL 33131
Tel: (888) 887-1776
*ecf@randazza.com*

*Counsel for Plaintiff*

**CERTIFICATE OF DIGITAL SUBMISSION**

I hereby certify that with respect to the foregoing:

(1) all required privacy redactions have been made per 11th Cir. R.

25.5;

(2) if required to file additional hard copies, that the ECF submission

is an exact copy of those documents;

(3) the digital submissions have been scanned for viruses with the most recent version of a commercial virus scanning program, TotalAV for MacOS, and according to the program are free of viruses.

/s/ Marc J. Randazza
Marc J. Randazza,
FL Bar No. 625566
RANDAZZA LEGAL GROUP, PLLC
2 S. Biscayne Blvd,
Suite 2600
Miami. FL 33131
Tel: (888) 887-1776
*ecf@randazza.com*

*Counsel for Plaintiff*